UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JUANITA MARIA OLIVER,
     Plaintiff,

                                   Case No.:  8:12-CV-2117-T-33MAP

v.

TECO ENERGY, INC.,
     Defendant.
_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Defendant, Tampa Electric Company ("TECO"),[1] pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 3.01(a), moves for summary judgment on the grounds that there exists no genuine issue as to any material fact, and the Defendant is entitled to summary judgment as a matter of law. The basis for this motion is set forth in the following memorandum of law.

## MEMORANDUM OF LAW

**I.    INTRODUCTION**

This case is currently before the Court on the Plaintiff's, Juanita Maria Oliver ("Oliver"), four (4) count complaint against TECO, wherein she attempts to invoke the Americans with Disabilities Act Amendments Act, 42 U.S.C. § 12112, 42 U.S.C. § 12203 (ADA), and the Florida Civil Rights Act (FCRA), § 760.11, Fla. Stat. Specifically, Oliver

---

[1] As stated in the Defendant Tampa Electric Company's second amended answer to the complaint, the Defendant TECO Energy is not a proper party to the complaint. The Plaintiff was at no time an employee of TECO Energy. Oliver has failed to exhaust the administrative prerequisites to file a suit against TECO Energy or any of the statutes which she invokes in her complaint and that entity. TECO Energy therefore is not a proper party to this case, the complaint fails to state a cause of action against TECO Energy and the Court does not have jurisdiction over any claim the Plaintiff may attempt to state against TECO Energy.

alleges that TECO discriminated against her on account of her disability when TECO "forced [her] to take medical leaves of absence," and retaliated against her for filing a Charge of Discrimination with the EEOC by disciplining and discharging her. (Dkt. 2  ¶¶ 18, 19, 23, 28, 31, 36). The discovered facts demonstrate that Oliver did not suffer any violation of her rights because she was not disabled as a matter of law, she was not regarded as disabled and she cannot prove that her referral to the Employee Assistance Program, based on her unusual behavior in the workplace, and her discipline and termination based on violation of TECO's policies, were discriminatory or retaliatory. Summary judgment is appropriate on all counts.

## II.     STATEMENT OF UNDISPUTED FACTS[2]

### A.     Background

Oliver was hired by TECO in October, 2004, as a Customer Sales Professional. (Dkt 2 ¶12). In that position, Oliver was responsible for answering phones and responding to customer inquiries. (Sugden 3 Ex. 1). Her primary duties and responsibilities included answering customer calls and responding to inbound telephone calls from internal and external customers regarding new service, billing, credit, payment plans, and other inquires. *Id.* Oliver was required to perform research of customer records, utilize appropriate systems and resources in order to respond effectively to customer inquiries and requests while maintaining call management goals. *Id.*

### B.     First Referral to EAP (February, 2008)

In or about February, 2008, Oliver informed her supervisor, Matthew Coleman

---

[2] The facts recited throughout are presented for purposes of summary judgment only. By reciting these facts, the Defendant does not intend to admit any facts not already admitted in the pleadings. Citations to the record will be made by identifying the record source, i.e., the Plaintiff's deposition ("Pl.") and Declarations (Declarant's name), followed by the referenced page, paragraph or exhibit number. The Plaintiff's first deposition is identified as "Pl. I."  The Plaintiff's second deposition, dated June 25, 2013, is identified as "Pl. II."

("Coleman"), of an issue that she allegedly was having with another TECO employee, Denise Bernal ("Bernal"). (Coleman 3; Pl. II, 59 Ex. 23[3]). Oliver reported that Bernal was giving her "dirty looks" and "bumped into her in the hallway." (Coleman 3). Oliver alleged that Bernal would kick her when Bernal would pass by. (Pl. II 59). After investigating Oliver's complaint and talking with Bernal, Coleman and Bernal's supervisor, Tina Findley ("Findley"), determined that Oliver's accusations were unfounded. (Coleman 4; Findley 4; Pl. II 49, 62-63).[4] Findley advised Bernal to be cordial when interacting with Oliver. (Findley 4). Coleman informed Oliver that the situation had been addressed. (Coleman 4).

The following day, Oliver left a voicemail for Findley and stated that she would not return to work until something was done about the situation involving Bernal. (Findley 5). In response to Oliver's refusal to return to work, Coleman contacted Raven Woodard ("Woodard"), former TECO Manager of Human Resources. (Coleman 5). Based on Oliver's unusual behavior in the workplace, the false allegations against Bernal and her refusal to return to work, Oliver was referred to the Company's Employee Assistance Program provider, Dr. Gary Wood. (Woodard 3; Coleman 5; Wood 2).

Oliver attended an initial assessment with Dr. Wood on February 19, 2008. Dr. Wood advised TECO that he recommended that Oliver be out of work until he approves her return. (Wood 3, Ex. A at 500393). On February 20, 2008, Dr. Wood noted that testing revealed a psychiatric symptomatology suggestive of a mood disorder and paranoia. (Wood 4, Ex. A at

---

[3] Oliver's notes reflecting the events from "February 18, 2007" and "February 20, 2007" were misdated, and should be read as February 18, 2008 and February 20, 2008, respectively. (Pl. II, 49-50, Ex. 23).

[4] Though Oliver recorded in her notes that Coleman, Findley, and Woodard called her "delusional" with regard to Plaintiff's allegations against Bernal, the Plaintiff stated in her deposition that the word "delusional" was the word Dr. Wood used to describe Oliver's behavior. (Pl. II, 62-63, Ex. 23).

500391). He recommended a psychiatric evaluation with Dr. Bala Rao. *Id.* Dr. Rao found Oliver was "hypomanic," and reluctant to take the medication that Dr. Rao prescribed. (Rao 3). On February 22, 2008, Wood contacted Employee Relations and advised that Oliver continued to receive evaluation coordinated by the EAP and that she would be out of work until March 17, 2008. (Wood 5, Ex. A at 500383).

On March 10, 2008, Wood advised that Oliver had received medical behavioral treatment for several weeks, and she "was able to resume her regular work duties and responsibilities" on March 13, 2008. (Wood 6, Ex. A at 500380). Dr. Wood did not share any of Oliver's confidential medical information with TECO. (Wood 20). Dr. Wood indicated that Oliver should comply with TECO's policies and procedures upon return. (Wood 6, Ex. A at 500380). Following her release, Oliver returned to work. (Martin 4). Just a few months later, on August 11, 2008, Oliver was promoted to the position of Associate Lead. (*Id.* at 5).

**C.      Second Referral to EAP (October, 2008)**

On or about October 21, 2008, Oliver was again mandated to EAP based on a report by a co-worker, Wayne Guthrie ("Guthrie"), that Oliver said that the sight of Denise Bernal made Oliver feel like she wanted to stab her. (Guthrie 3). Guthrie reported Oliver's statement to his supervisor, Tina Mary, and to Employee Relations and Human Resources. *Id.*

In response to the report, Oliver was asked whether she had ever threatened a co-worker. (Pl. II 67, Ex. 25 at 200073). Oliver admitted that she "threaten[s] the guys all the time. If I need them to do something, I tell them I will take it to the parking lot or I will stab ya." (*Id.*). After conducting an investigation, Oliver's supervisors contacted Dr. Wood, who advised them to bring Oliver to his office. (Pl. II 68; Coleman 6).

On October 23, 2008, Wood informed Employee Relations that he recommended Oliver be re-evaluated by her psychiatrist.[5] (Wood 7, Ex. A at 500375). Following the evaluation, on November 7, 2008, Dr. Wood informed TECO that Oliver could resume her work duties on November 10, 2008. (Wood 9, Ex. A at 500370). Oliver returned to work. (Martin 6). Though her statement violated policy, Oliver was not disciplined. (Pl. I 23).

**D.      Third Referral to EAP (December, 2008)**

On December 8, 2008, Oliver was mandated to Dr. Wood for a third time after she made additional unfounded allegations regarding Bernal. (Wood 10, Ex. A at 500369; Pl. II 70-71). Oliver expressed concern that Bernal was coming into Oliver's work area, acting inappropriately, circling her, and following her. (Pl. II 70-71, 87, Ex. 27; Wood 10, Ex. A at 500367). Oliver's allegations were investigated, and it was determined Bernal did not engage in any inappropriate behavior. (Pl. I 25; Woodard 4; Wood 10, Ex. A at 500369).

Dr. Wood performed an assessment, and informed Employee Relations that Oliver was compliant with her medical behavioral treatment, and cleared her to return to work without restrictions. (Wood 11, Ex. A at 500366, 500368). Oliver returned to work. (Martin 7; Wood 11, Ex. A at 500355).

**E.      Fourth Referral to EAP (November, 2009)**

On July 29, 2009, Oliver was promoted to Lead I. (Sugden 8, Ex. 3). Reports of Oliver's unusual behavior continued, both from co-workers and customers.  On August 17, 2009, Sugden received a report from Ta'Shaney Barber ("Barber"), Senior Lead, regarding

---

[5] On October 23, 2008, Dr. Wood indicated that, "she needs to be re-evaluated to determine if she is having a recurrence of paranoia. She was defensive and indicated that she thinks she is being harassed and she plans to talk with an attorney. I spoke to Dr. Rao . . . and we agreed that he would see her tomorrow morning at 9:00 a.m. for a re-evaluation. I have taken her out of work until November 10, 2008." (Wood 8, Ex. A at 500376).

Oliver's rude behavior and unacceptable, condescending tone toward Rabiah Hollis ("Hollis"). (Sugden 9, Ex. 4; Barber 3, Ex. 1). Oliver was consistently rude to Hollis on the phone, and refused to answer questions Hollis needed to assist customers. *Id.*

On September 24, 2009, after Sugden received a customer complaint, Oliver reviewed the problematic call with Tina Mary ("Mary"), Supervisor of Training, responsible for Quality Monitoring. (Sugden 10, Ex. 5). Mary went though the call segment with Oliver and provided feedback regarding Oliver's tone, word choice and overall call handling. *Id.* After reviewing the call, Oliver did not agree with the feedback, did not interact much, and maintained that she handled the call properly. *Id.*

On October 2, 2009, Sugden received a report from Kim Nichols ("Nichols"), regarding Oliver's rudeness and strange behavior. (Nichols 3; Sugden 11, Ex. 6). Specifically, Nichols reported that while she was on the phone with Oliver, Oliver handed the phone to a co-worker, and simply refused to talk to Nichols. *Id.*

On October 8, 2009, Oliver created a scene in the call center, causing a disruption, when Oliver refused to follow company procedure. (Sugden 12, Ex. 7). Oliver stated that she did not agree with the procedure and would use her own judgment rather than complying. *Id.* Sugden advised Oliver that TECO procedure was to be followed. *Id.* Oliver stated that she "ha[d] a problem doing it." *Id.* I advised Oliver that company procedure must be followed. *Id.* Oliver could have been disciplined for her behavior, but she was not. (Sugden 12).

On October 9, 2009, Barber reported that Oliver was "snappy and rude to others." (Sugden 13, Ex. 8; Barber 4). Barber stated that "team members were telling each other to stay away from Maria." (Sugden 13, Ex. 8). Sugden noted that since did not observe the

behavior, she did not address it with Oliver but she felt the need to document the trend. *Id.*

On October 15, 2009, Oliver had an outburst at her desk after taking a call. (Sugden 14, Ex. 9).  Oliver "slam[med] her fists on her desk, squeal[ed] and put her head down while beating on the desk." *Id.* Sugden asked Oliver if she was okay, to which Oliver replied, "I can't take these people anymore." *Id.* That same day, India Banks reported that team members had complained of Oliver's rude and disrespectful behavior. (Sugden 14, Ex. 10).

On October 27, 2009, Joselyn Nieves ("Nieves") reported that Oliver grabbed half of a sandwich out of Nieves' hand as she was handing the half to Nichols. (Nieves 3; Sugden 15, Ex. 11). Nieves stated that Oliver dropped the sandwich at her feet, and stomped away with her fists clenched. *Id.* On the same date, Nichols, Barber, and Jennifer Weatherly ("Weatherly"), Senior Lead, reported that they were in fear of Oliver. (Sugden 15, Ex. 11). Sugden's notes recorded that the three "also indicate[d] they have gotten this [before,] not only from other team members but from other people on the floor." *Id.*

On October 29, 2009, Oliver attended a training class entitled, "Respect in the Workplace." (Sugden 16, Ex 12). This class was designed to assist employees in responding and resolving personal conflicts in the workplace. (Sugden 16).

Based on reports that Oliver was disrupting other team members with her off-target behavior, failing to treat her peers, coach and other team members with respect by causing a scene,[6] not following Sugden's direction, and not supporting team goals and directives, it was

---

[6] Regarding this "scene," Oliver balled up her fists, stomped off to the back of the aisle, and yelled for another employee to come over. (Pl. I 44, Ex. 6; Sugden 18, Ex. 13). Oliver admitted to raising her fists and shaking them in the air at work while saying, "[d]amn, damn, damn." (Pl. II 99-101).

determined that Oliver should be disciplined.[7] (Sugden 19). TECO has a Positive Discipline system in place to ensure fair treatment for all employees. (Sugden 4, Ex. 2). The purpose of Positive Discipline is to help employees achieve expected behavior in individual performance, conduct, and attendance. (Sugden 5, Ex. 2). The key components of Positive Discipline are positive reinforcement, problem solving techniques, coaching and counseling, and then finally, formal discipline steps--namely, Oral Reminder, Written Reminder, Decision Making Leave, and Termination. *Id.* The process is intended to serve as positive training, involving coaching and counseling aimed at self-management. *Id.* All employees of TECO are required to exhibit the productive behaviors in universal dimensions of Adaptability, Commitment to Excellence, Fostering Open Dialogue, Initiative, Judgment, Own the Outcome and Teamwork. (Sugden 6, Ex. 2). Additionally, TECO provides support to employees including the opportunity to improve and develop skills to perform their jobs at an acceptable level, by utilizing, among others, the Employee Assistance Program (EAP). (Sugden 7, Ex. 2). Oliver was issued the second step of Positive Discipline, a Written Reminder. (Sugden 19, Ex. 14; Pl. I 44, Ex. 6). As part of the corrective action plan, Oliver was required to attend an initial assessment appointment with EAP. *Id.*

On November 3, 2009, Dr. Wood informed Employee Relations that he required Oliver to obtain a psychiatric re-evaluation, and would notify TECO regarding when Oliver could return to work.[8] (Wood 12, Ex. A at 500355; 500336). At Dr. Wood's direction, Dr.

---

[7] Oliver had been released to work without restrictions in March, November and December, 2008.

[8] Dr. Wood noted that "Oliver has been noncompliant with psychiatric treatment (no follow up visits with the psychiatrist). . . She acknowledges that she did speak back to her supervisor. Her energy was high and the content of her thinking was inappropriate. I am concerned that she is hypomanic and developing characteristic consistent with a thought disorder." (Wood 13, Ex. A at 500365).

Rao performed Oliver's fitness for duty evaluation. (Rao 5, Ex. A at 500409-13). On December 28, 2009, TECO was notified that Oliver was not released to return to work and would be receiving additional treatment. (Wood 16, Ex. A at 500333). Oliver failed to follow through with the instructions of the doctors, which resulted in delay in Oliver's return to work. (Wood 17).[9] On March 17, 2010, Dr. Wood informed TECO that Oliver could return to work without restriction as of March 23, 2010. (Wood 19, Ex. A 500334). Oliver was then allowed to return after a four and a half month absence. (Pl. II 15; Sugden 20, Exs. 15, 16).

### F.      Oliver's Return to Work

The day after her return, on March 24, 2010, Oliver requested training updates. (Pl. II 33, 34; Sugden 20, Ex. 16 at 000049-50). Sugden and Training Supervisor Tina Mary gave Oliver directions as she requested it. *Id.* On March 25, 2010, Oliver requested additional training. (Sugden 20, Ex. 16 at 000049-50). Juan Gonzalez ("Gonzalez"), Lead Customer Care Learning Facilitator, met with her to review her MAO test results and to answer any questions she had. (Gonzalez 3). After their meeting, Gonzalez indicated that Oliver was ready to return to the phone lines. *Id.*

In an effort to assist Oliver with the transition to the workplace after the long absence and to address the off-target behavior that she had been exhibiting that led to the Written

---

[9]  On January 28, 2010, Dr. Wood contacted Rao, and Rao informed Wood that Oliver was to schedule an appointment with him in January, but she had not yet scheduled that appointment. (Wood 17, Ex. A at 500330). Also, Oliver was to forward to Rao a report from another one of Oliver's doctors for Rao to review. *Id.* Oliver had not sent that report. *Id.* Wood called Oliver's cell phone and left a message for her to call Dr. Rao regarding the appointment that she was to schedule and the report that she was to forward to Dr. Rao *Id.* On February 15, 2010, Dr. Wood spoke with Dr. Rao again. (Wood 18, Ex. A at 500339). Oliver had not forwarded her records to Dr. Rao's office. *Id.* Dr. Wood again contacted Oliver and requested she forward her records to Dr. Rao. (Wood 18, Ex. A at 500338). On March 8, 2010 Dr. Wood received a call from Dr. Rao indicating that Oliver had not yet supplied him with a report from her other doctor nor has she followed up with him for an evaluation. (Wood 18, Ex. A at 500337).

Warning in November, 2009, Sugden provided Oliver with a "Consolidation of Expectations." (Sugden 21, Ex. 17). Oliver refused to take the packet. (Sugden 21, Ex. 16 at 000051). Oliver was advised that she needed to maintain consistent behaviors, including effective communication, respect for others, remaining calm, participating actively and effectively in team meetings, and working effectively when feeling stress or pressure due to opposing ideas, resistance from others, conflicts, changes, and complaints. (Sugden 21, Ex. 17, Ex. 16 at 000051-52). When Sugden advised Oliver of the expectations, Oliver refused to make eye contact or converse with Sugden. *Id.*

### G.    Oliver is Disciplined for Violation of TECO's Policies

In April, 2010, Oliver violated customer services procedures when she told a customer that he had to pay his TECO bills or his lights would be turned off. (Sugden 22 Ex. 18 at 000062-66, 000073). Sugden listened to the call and determined that Oliver had violated customer service procedure and the Standards of Integrity when she told the customer that TECO sent a technician to his home, turned the electricity off, sealed the meter and insinuated that the customer had been stealing electricity from the company; this was not true. (Sugden 22, Ex. 18 at 000062-66, 000073). Oliver hung up on the customer. (Sugden 22, Ex. 18 at 000062, 000073; Ex. 19).  The customer complained that Oliver was rude and condescending. (Sugden 22, Ex. 18 at 000062-66, 000073). On April 28, 2010, Oliver acted inappropriately during a "meet and greet" session with the newly hired Customer Service Professionals when she "walked down the aisle and spoke . . . names and then proceeded to say 'You all need to open your mouths. You need to open your mouths and talk to people.'" (Guthrie 4, Ex. 1). Oliver came face to face with another employee and stated, "Because I

will get in your face, 'cause I'll get in your face." *Id.* The subject employee was startled, pushed back, and had a confused look. *Id.* Other team members expressed shock regarding Oliver's behavior. *Id.*

As a result, Oliver was placed on the next level of Positive Disicpline, a Decision Making Leave ("DML"), on April 30, 2010, for providing incorrect information to a customer, failing to follow customer service procedures, and failing to treat her peers, coach and team members with respect. (Sugden 23, Ex. 19). Oliver's provision of incorrect information violated TECO's Standards of Integrity. *Id.* Oliver did not follow proper customer service procedures which violated TECO's core value of Customer Service. *Id.* Oliver was directed to maintain the Standards of Integrity by providing correct information to all customers, adhere to all Core Values, including Customer Service and Respect for Others, display on-target behaviors regarding Judgment and Commitment to Excellence, listen to customers' needs, use empathy and respond appropriately, research answers and handle all calls to final resolution, and effectively communicate to her customers, team members and her Performance Coach. *Id.* Consistent with the Positive Discipline program, Oliver was advised that any infraction of her DML, company safe work practices, policies, work rules, operating procedures and regulations might result in her termination of employment. *Id.*

On June 22, 2010, Oliver was directed by members of TECO management to attend a "Meet and Greet" meeting for a new hire class. (Sugden 24, Ex. 20; Gonzalez 4, Ex. 1). Oliver was previously invited to this meeting. (Sugden 24, Ex. 21). Gonzalez directed Oliver to attend. (Gonzalez 4, Ex. 1). Oliver refused. *Id.* Sugden then directed Oliver to attend. (Sugden 24, Ex. 16 at 000058; Ex. 20). Oliver again refused. *Id.*

11

On June 23, 2010, Oliver caused a disruption when she screamed at Weatherly. (Weatherly 5; Sugden 25, Ex. 16 at 000058). That day, Sugden spoke with Devon Rudloff, Human Resources Generalist, regarding the incidents that took place on June 22 and June 23, 2010. (Sugden 26, Ex. 16 000059). Following the discussion with Human Resources, Sugden requested a meeting with the Employee Status Review Committee ("ESRC"), to recommend termination for Oliver's failure to comply with the terms and conditions of her DML, insubordination and failure to adhere to TECO's core value of Respect for Others regarding the event that took place on June 22, 2009. *Id.* The ESRC is composed of Human Resources personnel and members of management, who are outside the employee's chain of command. (Woodard 5). These individuals carefully review cases to ensure that the employee has been afforded due process, and to reach a "company decision" regarding a termination recommendation. (Sugden 26, Ex. 2).

Oliver was terminated on July 2, 2010 for her violation of the terms and conditions of her DML. (Sugden 27, Ex. 20). Specifically, Oliver was terminated for her insubordination by failing to attend a meeting as directed by TECO management. *Id.*

### H.    The Plaintiff's Charges of Discrimination

Oliver filed two Charges of Discrimination against TECO.[10] The first charge, dated November 13, 2009, alleged discrimination based on race and disability. (Pl. I 49, Ex. 7; Martin 9). Specifically, Oliver alleged that "[o]n February 18, 2008, October 23, 2008, and November 3, 2009, I have been forced on a medical leave of absence." (Pl. I 49, Ex. 7).

---

[10] The Defendant anticipates that Oliver will argue that she filed a charge of discrimination in February of 2008. However, the Plaintiff never produced a copy of that charge during discovery, and TECO never received notice of any such charge. (Martin 10).

Oliver also disputed the facts underlying the reasons for the mandate to EAP. *Id.* Oliver's second charge, dated October 27, 2010, was filed after her termination. (Sugden 27; Pl. I 86, Ex. 13). She alleged that TECO retaliated against her when it fired her for filing her previous charge of discrimination on November 13, 2009. (Pl. I 86, Ex. 13). The undisputed facts conclusively demonstrate that Oliver suffered no violation of her rights. TECO is entitled to judgment in its favor as a matter of law.

## III.   LEGAL ARGUMENT

### A.  The Plaintiff Cannot Establish a Prima Facie Case of Discrimination

To establish a prima facie case under the ADAAA and the FCRA, Oliver must show that she (1) had a disability; (2) was otherwise qualified to perform the job; and (3) was discriminated against based on her disability. *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1149 (11th Cir. 2005).[11] An individual is disabled under the ADAAA if: (1) she has a physical or mental impairment that substantially limits a major life activity (referred to as an "actual disability"); (2) she has a "record of such impairment"; or (3) she is "regarded as having such an impairment." [12] 42 U.S.C. § 12102(1).

In this case, Oliver relies on the first, second and third provisions regarding having a disability. She maintains that she had a mental impairment that substantially limited a major life activity and had a record of such impairment. She also maintains that, even if she did not

---

[11] Disability-discrimination claims under the FCRA are analyzed under the same framework as ADA claims, and are to be considered together. *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1224, n. 2 (11th Cir. 2005) *citing Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1221 (11th Cir. 2000).

[12]   The Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") became effective on January 1, 2009. Although the ADAAA left the ADA's three-category definition of "disability" intact, significant changes were made regarding the interpretation of these categories.

have such an impairment, she was regarded has having a disability. Though the Plaintiff may have an actual disability, she cannot prove that she was regarded as having a disability. Moreover, the Plaintiff is not a qualified individual with a disability, and as such she is not disabled for purposes of the ADAAA as a matter of law.

      **(i)    Plaintiff may have an actual disability; however, she was not regarded as having a disability.**

The Defendant first addresses whether Oliver had an "actual disability," that is whether she had a physical impairment that substantially limited a major life activity. According to the medical records and Oliver's statements, Oliver was diagnosed with bipolar disorder. (Pl. Resp. to D's Rogs #7; Rao 5.). For purposes of this motion, TECO will assume that Oliver is actually disabled by virtue of having bipolar disorder as the disorder substantially limits brain function. 29 C.F.R. § 1630.2(j)(3)(iii).

Under the "regarded as" provision, as amended by the ADAAA, an individual is regarded as having a disability if "she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Oliver's supervisors were not aware of Oliver's disability. (Sugden 28; Coleman 7; Findley 6). Indeed, information regarding the specific diagnosis was never shared with TECO. Oliver cannot establish that she was perceived as substantially limited in any major life activity.

TECO anticipates that Oliver will assert that she was regarded as disabled based on comments made about her by co-workers to supervisors; however, this claim fails. *Mickens v. Polk Co. Sch. Bd.*, 430 F. Supp. 2d 1265, 1274 (M.D. Fla. 2006). As a matter of law, "[p]ersonality conflicts among coworkers (even those expressed through the use [or misuse]

of mental health terminology) generally do not establish a perceived impairment on the part of the employer." *Mickens*, 430 F. Supp. 2d at 1274. Moreover, Oliver cannot establish that TECO regarded her as disabled by referring her to EAP because TECO was entitled to explore the cause of Oliver's aberrant behavior without violating the ADA. *Id.* Oliver admits she never heard Sugden call her as "psycho," and she never complained of discrimination based on these comments. In fact, Oliver never complained on discrimination based on any protected characteristic. Oliver was not regarded as disabled by TECO.

**(ii)     Plaintiff was not "Otherwise Qualified" Under the ADA**

Regardless of whether Oliver was actually disabled, Oliver's claim of discrimination fails because she is not a qualified individual with disability. A qualified individual with a disability refers to an "individual with a disability who satisfies the requisite skill, experience, education, and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m) (2012); *Davis v. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). The ADA does not require employers to employ individuals who are not capable of performing the duties of the position to which they aspire. *Sutton v. Lader*, 185 F.3d 1203, 1211 (11th Cir. 1999). If a plaintiff is unable to perform an essential function of her position, with or without an accommodation, the plaintiff is, by definition, not a "qualified individual" and not covered under the ADA. *Davis*, 205 F.3d at 1305. In order to establish that a function is essential, the following evidence is evaluated: the employer's judgment, job description, the amount of time spent performing the function, the consequences if the individual fails to perform the function, and

the work experience of past and present individuals in performing the job. *See* 29 C.F.R. § 1630.2(n)(2); *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000).

An employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position, and absence of such skills prevents the employee from being otherwise qualified under the ADA. *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306 (11th Cir. 2013); *Mickens*, 430 F. Supp. 2d at 1282; *Foley v. Morgan Stanley Smith Barney, LLC*, 2013 WL 795108, *6 (S.D. Fla. Mar. 4, 2013) (stating "there is no requirement [under the ADA] that an employer tolerate unprofessional behavior for a certain period before it is entitled to discharge an employee"). Oliver's job description required that she "[m]ust have a strong customer service aptitude, the ability to stay calm, level-headed and resilient, and have the ability to convey empathy as well as professionalism." (Sugden 3, Ex. 1).

The record shows that Oliver continuously failed to work reasonably well with others. *Foley*, 2013 WL 795108, *6. Oliver's outbursts disrupted the work environment. Oliver refused, on a number of occasions, to speak with Sugden and make eye contact with her. Even after counseling, Oliver continued to behave unprofessionally. Oliver routinely slammed her fists down and yelled at co-workers. Oliver is not otherwise qualified under the ADA, because she could not work reasonably well with others and could not manage stress. *Owusu-Ansah*, 715 F.3d at 1306; *Foley*, 2013 WL 795108, *6, 9.

> **(iii)    Oliver was not subject to unlawful discrimination because of her disability.**

Employees can show discrimination under the ADA by showing that they have been

treated differently or suffered an adverse employment decision because of their disability.[13] *Nadler v. Harvey*, 2007 WL 2404705 (11th Cir. Aug. 24, 2007). However, before an employer can discriminate against an employee because of that employee's disability, the employer must be aware of that disability. *Morisky v. Broward Co.*, 80 F.3d 445, 448 (11th Cir. 1996). A plaintiff must show that the individual(s) responsible for making the decisions knew the plaintiff had a disability at the time the decisions were made. *Id.*

### a.   TECO was not aware of Oliver's disability.

Neither Dr. Rao nor Dr. Wood shared any of Oliver's diagnoses with TECO. (Wood 20; Rao 9; Sugden 28, 29). Oliver may argue that TECO did have knowledge of a disability based on the charge of discrimination on November 13, 2009, citing "disability" as one of the bases of discrimination. However, she claimed only that she was "perceived as disabled," not that she was actually disabled. She did not identify any disability in the charge. (Pl. I 49, Ex. 7). As explained above, Oliver was not perceived as disabled.

### b.   Oliver cannot adduce evidence of a comparator.

At all times during her employment, Oliver was treated the same as all other

---

[13] Count I is titled "Americans with Disabilities Act-Discrimination." (Dkt. 2). Oliver puts forth the conclusory allegation that she was "discriminated" against and "harassed" on account of her disability. (Dkt. 2 at ¶ 23). Oliver makes no other allegations related to harassment. Id. Oliver did not bring a separate hostile work environment claim. The Court should dismiss any such claim, should Oliver make any assertion in her response to this motion that she was subjected to a hostile work environment. *Palmer v. Albertson's, LLC*, 418 Fed. App'x 885, 889-890 (11th Cir. 2011). Such a claim would fail. A hostile work environment claim requires a plaintiff to show a number of factors, including that harassment was sufficiently severe or pervasive to alter the terms and conditions of employment. *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008). To determine whether the conduct was objectively severe or pervasive, "courts look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* Oliver has failed to put forth any evidence that objectively establishes conduct that was sufficiently severe or pervasive. Oliver never reported harassment. Even if she was harassed,, her unreasonable failure to take advantage of TECO's preventive or corrective opportunities under its non-discrimination policy (Martin 11, Ex. 1) entitles TECO to the *Faragher* affirmative defense. *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

employees, regardless of disability. To the extent Oliver claims she was targeted for inappropriate testing by TECO because of her disability when it placed her in test mode for training purposes, and thus was treated differently due to her disability, Oliver stated that other individuals were subjected to the same training methods in the same manner that she was. (Pl. II 87). To the extent Oliver argues that she was treated differently on account of her disability because she was not given proper training when she returned to work in March, 2010, the record reflects that upon her return to work, Oliver was given the training she requested on the day she requested it. (Sugden 20, Ex. 16 at 000049-50). Moreover, when Oliver requested additional training, she received it. *Id.* Neither the DML nor the termination was related to any lack of training. Oliver has failed to identify any other employee who engaged in the same or similar misconduct but was treated more favorably.[14] Therefore, summary judgment is appropriate. *Wolfe v. Postmaster Gen.*, 488 Fed. App'x 465, 468 (11th Cir. 2012).

The fact that Oliver's mental illness may have played a role in causing Oliver to act out does not mitigate her misconduct. "The law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability." *Foley*, 2013 WL 795108 at *8 (internal quotation and citations omitted). The court in *Foley* adopted the reasoning of Judge Posner from *Palmer v. Cir. Ct. of Cook Co., III.*, 117 F.3d 351, 3552 (7th Cir. 1997) (Posner, J.):

There is no evidence that [the plaintiff] was fired because of her mental illness. She

---

[14] In response to Interrogatories, Oliver identifies Twyla Hickmon and Valerie Batchelor as individuals who may have knowledge of the facts alleged in her amended complaint. (Pl's Resp. to D's Rogs #2). Both of these individuals were terminated for misconduct. Both filed suit against TECO in this Court alleging discrimination. Summary judgment was granted in TECO's favor in both suits. (Case 8:10-cv-01147-JSM-MAP, Dkt. 47; Case 8:08-cv-00144-JSM-TGW, Dkt. 47).

was fired because she threatened to kill another employee. The cause of the threat was, we may assume, her mental illness . . . But if an employer fires an employee cause of the employee's unacceptable behavior, the fact that the behavior was precipitated by a mental illness does not present an issue under the Americans with Disabilities Act. *Foley*, 2013 WL 795108 at *7.

Oliver cannot produce any evidence that she was disciplined because of any disability. In fact, the record shows that TECO was not aware of the disability and Oliver was afforded the benefits of Positive Discipline, and was given many opportunities to reform her unacceptable behavior. *Foley*, 2013 WL 795108 at *7.

### c.   TECO was entitled to mandate the Plaintiff to EAP

Under the ADA, mental and physical examinations are allowed if the examination is used to determine whether the "employee can perform job-related functions." *Roberts v. Rayonier, Inc.*, 2005 WL 3500320 (M.D. Fla. Dec. 21, 2005). "[J]ob-relatedness is used in analyzing the questions or subject matter contained in a test or criteria used by an employer as a basis for an employment decision, while business necessity, in context, is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria for such a decision." *Owusu-Ansah*, 715 F.3d at 1311. "Generally a doctor's refusal to release a person to return to work is a legitimate reason for an employer to prevent that person from returning to work." *Calvo v. Walgreens Corp.*, 340 Fed. App'x 618, 624 (11th Cir. 2009).

The court in *Owusu-Ansah* affirmed summary judgment for the employer, and held that it did not violate 42 U.S.C. § 12112(d)(4)(A) when it required the plaintiff, a call center employee who had been placed on leave after allegedly making threats against other employees, to undergo a psychiatric/psychological fitness-for-duty evaluation prior to

returning to work. *Owusu-Ansah* 715 F.3d at 1312. The ADA was not violated since the evaluation was job-related and consistent with business necessity; the employee's ability to handle stress and work well with others was essential for his position; and the employer had reasonable, objective concerns regarding the plaintiff's mental state and safety of its staff based on the plaintiff's meeting with his supervisor in which he allegedly expressed concerns about discrimination, banged his fist on a table, and claimed someone was "going to pay." *Owusu-Ansah*, 715 F.3d at 1312; *see also Mickens*, 430 F. Supp. 2d at 1279 (stating that "[e]mployers must be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims").

TECO was entitled to mandate Oliver to EAP, and did so only after she refused to return to work, displayed behavior indicating she was unable to perform her job duties, was unable to get along with others, or that she was a threat to co-workers' safety. Oliver may argue that the incidents reported to Sugden did not actually occur; however, whether she actually engaged in the behavior is irrelevant to the analysis under the ADA. In fact, even if Oliver's co-workers were "lying through their teeth," there is no discriminatory action if Sugden acted on an honest belief that the complaints were true. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). The referrals to EAP were not discriminatory, and the fact that Dr. Wood and Dr. Rao kept Oliver out of work for extended periods of time proves that TECO had legitimate reasons to be concerned about her behavior.

### d.   Plaintiff's Additional Allegations of Discrimination

To the extent that Oliver argues that the Sugden's use of the word "psycho" in some of her documentation regarding complaints received by Oliver's co-workers is

discriminatory, Sugden's notes reflect direct quotations from Oliver's co-workers, including Nichols, Nieves, Barber, and Weatherly, regarding Oliver's unusual behavior. (Sugden 9-15). In fact, in the note regarding Nieves' report, Sugden noted that since she did not observe the behavior, she did not address it, but documented the trend. (Sugden 13, Ex. 8). Oliver admitted that she never heard Sugden call her a "psycho." (Pl. II 98). Sugden's documentation was proper in light of Oliver's continued off-target behavior.

In response to interrogatories, Oliver argues that she was denied a promotion. Oliver fails to identify any position to which she should have been promoted. (Pl's Resp. to D's Rogs 8). In fact, Oliver was promoted twice during her tenure with TECO, once on August 11, 2008, and once by Sugden on July 29, 2009, after being referred to EAP three times. (Martin 5; Sugden 8). Finally, Oliver never alleged that TECO failed to promote her in any of her charges to the EEOC. As such, any such claim is barred. 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109-10, 113-15 (2002); *Gay v. AirTran Airways, Inc.*, 427 Fed. App'x 743, 745 (11th Cir. 2011); *Price v. M & H Valve Co.*, 177 Fed. App'x 1, 10 (11th Cir. 2006).

Oliver argues that she was "[d]enied [the] opportunity to refute claims of 'psycho' during normal grievance procedures." (Pl's Resp. to D's Rogs 8). Oliver fails to allege when she was denied such an opportunity, and produces no evidence of such denial. Oliver did not grieve her allegedly discriminatory treatment. (Pl. II 39). As a Union Steward, Oliver was well-versed in grievance procedure. (Pl. I 64). Oliver grieved her November 2, 2009, Written Warning. (Pl. I 52, Ex. 8). Oliver's failure to raise issues during a grievance cannot serve as a basis for a claim of discrimination against TECO.

Oliver argues that she was discriminated against when TECO allegedly denied her "seniority shift selection due [to] extensive administrative leave." (Pl's Resp. to D's Rogs 8; Pl. II 34). Oliver cannot produce evidence of such denial. Again, Oliver failed to raise the issue in any charge to the EEOC or in any grievance. (Pl. II 34-35, 39, 40, Ex. 18). As such, any claim is barred as a discrete act. *See Gay*, 427 Fed. App'x at 745; *Price*, 177 Fed. App'x at 10. Moreover, Oliver's own actions prolonged return to work, and thus the "extensive administrative leave" about which Oliver complains was her own doing. From December 28, 2009, to March 8, 2010, Oliver failed to comply with Dr. Rao's requirements regarding her fitness for duty examination to be completed prior to his authorization for Oliver to return to work. (Rao 6). Dr. Wood contacted Oliver multiple times and urged her to comply with the requirements in order to facilitate her return to work. (Wood 17, 18). She failed to comply and her failures cannot be a basis for a claim of discrimination against TECO.

**B.     The Plaintiff Cannot Show Pretext for Disability Discrimination.**

Oliver cannot establish a prima facie case under the ADAAA, but even if she could, TECO has legitimate, non-discriminatory reasons for its actions. Once a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). However, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Silvera v. Orange Co. Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001).

If a defendant satisfies its burden of articulating a legitimate, non-discriminatory reason for the challenged employment action, the burden of production shifts back to the

plaintiff to present "significantly probative evidence that the proffered reason is pretext for discrimination." *Carter v. City of Miami*, 870 F.2d 578 (11th Cir. 1989). Specifically, a plaintiff must offer evidence "demonstrat[ing] that the proffered reason[s] w[ere] not the true reason[s] for the employment decision[s]." *Combs v. Plantation Patterns*, 106 F. 3d 1519, 1528 (11th Cir. 1997); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

A plaintiff is not allowed to recast the employer's proffered non-discriminatory reasons or substitute his own business judgment for that of her employer. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). Provided that the proffered reason is one that might motivate a reasonable employer, a plaintiff must "meet that reason head on and rebut it" with evidence of pretext. *Wilson v. B/E Aerospace, Inc*, 376 F.3d 1079, 1088 (11th Cir. 2004); *Chapman*, 229 F.3d at 1030. A plaintiff cannot succeed by simply questioning the wisdom of the business decision at issue. *Combs*, 106 F.3d at 1543. Even if the court disagrees with the employer's decision, it cannot second-guess that decision. A court's role in determining whether a defendant's proffered reason is pretextual is not to re-examine the defendant's business decisions. *Chapman*, 229 F.3d at 1030; *Elrod*, 939 F.2d at 1470; *Damon v. Fleming Supermarkets, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).

Oliver cannot meet her burden. As explained above, TECO had legitimate, nondiscriminatory reasons for the referrals to EAP, the Written Warning, the DML, and ultimately, the termination.

### i.   EAP

Oliver's first referral to EAP occurred after she refused to return to work after making unfounded allegations against Bernal. The second referral was as result of Oliver's

threatening to stab a co-worker. The third referral occurred as a result of Oliver's additional unfounded allegations of harassment against Bernal. Oliver's final referral to EAP occurred as a result of continued reports from her co-workers regarding her unusual behavior, failure to follow Sugden's direction, acting out and causing a disruption in the call center.

### ii.   Written Warning

Oliver was issued a Written Reminder on November 3, 2009, based on complaints from customers, who stated that Oliver was rude to them, Oliver's disruption of other TECO employees, failure to treat her peers, coach and other team members with respect, not following Sugden's direction, and not supporting team goals and directives.

### iii.   Decision Making Leave

Oliver was given a DML, on April 30, 2010, for providing incorrect information to a customer, failing to follow customer service procedures, and failing to treat her peers, coach and team members with respect. Oliver did not follow proper customer service procedures, which violated TECO's core value of Customer Service. Additionally, Oliver acted inappropriately during a "meet and greet" session with new hires.

### iv.   Termination

Oliver was warned, in her DML, that "[d]uring this period, any infraction of this [DML], company safe work practices, policies, work rules, operating procedures and regulations may result in termination of your employment." (Sugden 23, Ex. 19). Oliver violated the terms and conditions of her DML by engaging in insubordination, and was terminated as a result. (Sugden 27). The decision to terminate was made by the ESRC. Oliver cannot show pretext by disagreeing with the committee's findings. *Elrod*, 939 F.2d at 1470.

**C.      The Plaintiff Cannot Show that TECO Retaliated Against Her.**

To establish a claim for retaliation under the ADA, Oliver must show: "(1) that [s]he engaged in statutory protected activity; (2) that [s]he suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action." *Wilbourne v. Forsyth Co. Sch. Dist.*, 306 Fed. App'x. 473, 476 (11th Cir. 2009). "Once a plaintiff has established a prima facie case [of retaliation], the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

TECO concedes that the Written Reminder, DML and termination are adverse employment actions.[15] However, Oliver cannot show a causal connection. The length of time separating Oliver's November, 2009 Charge and her DML and subsequent termination, five and seven months, respectively, is, as a matter of law, not enough to create a presumption of retaliation. *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006). TECO had legitimate, non-discriminatory reasons for Oliver's discipline. Oliver had been released to full duty without restrictions on March 23, 2010. She was required to abide by TECO's policies and procedures and adhere to its Standards of Integrity and Core Values. She did not. Summary judgment is appropriate on the retaliation claim. *See Williams*, 303 F.3d at 1292.

**IV. CONCLUSION**

For the foregoing reasons, the Defendant respectfully requests that this Court enter summary judgment in its favor on all claims contained in Oliver's Complaint.

---

[15] The November 3, 2009 Written Reminder preceded the filing of the Charge and therefore could not have been retaliatory. Indeed, Oliver references the November 3, 2009, discipline in the Charge.

Respectfully submitted,


/s/Thomas M. Gonzalez
Thomas M. Gonzalez
Florida Bar No.: 192341
Erin G. Jackson
Florida Bar No.: 0413097
Thompson, Sizemore, Gonzalez,
& Hearing, P.A.
201 North Franklin Street, Suite 1600
Tampa, Florida 33602
Telephone: (813) 273-0050
Facsimile: (813) 273-0072
tgonzalez@tsghlaw.com
ejackson@tsghlaw.com
Attorneys for the Defendant

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished via CM/ECF on this 26th day of August, 2013, to the following:

Richard L. Bradford, Esq.
Bradford and Bradford, P.A.
150 East Bloomingdale Avenue, Suite 126
Brandon, FL 33511
Rich@bradfordfirm.com



/s/Thomas M. Gonzalez
Attorney